CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 20 2006

JOHN F. CORCORAN, CLERK
BY:
         DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Criminal Action No.: 5:05CR00025 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| CHARLES LUTHER VARNER, | ) |
| and | ) |
| MAUREEN ELAINE VARNER. | ) By: Samuel G. Wilson |
| | ) United States District Judge |

The defendants, Charles Luther Varner and his wife, Maureen Elaine Varner, are charged in conspiracies to distribute methamphetamine and launder money. Mr. Varner is also charged with operating a still and with various untaxed liquor and firearms violations. This matter is before the court on two motions. First, the Varners have moved to suppress evidence from the search of their residence. They contend that the search warrant that authorized the search lacked probable cause and was based on an intentionally or recklessly false affidavit. Second, they have moved to dismiss the charges against them on the grounds that the government intentionally and in bad faith destroyed evidence seized in that search that was significant to their defense. The court finds that the motions lack merit and denies them.

I.

On November 4, 2004, Virginia Alcoholic Beverage Control Special Agent D.L. Blye applied to a Virginia magistrate for a search warrant to search the Varner residence. In his affidavit, Blye stated the following:

On 10/6/04 S/A D.L. Blye received information from a confidential informant that

> Charles Varner was manufacturing "moonshine" from a copper still located in the garage at his residence. The informant stated that it was a 15-20 gallon still that produces approximately 20-30 gallons a week and that he sells it for 20-25 dollars a quart to friends and acquaintances.
>
> On 11/03/04 at S/A D.L. Blye conducted surveillance on the residence and observed the garage door open. Blye observed a large tank consistent with a still; similar to an oil tank on it's [sic] side occupying the left side of the garage. The tank appeared to have a vent pipe, which would be consistent with a "doubler" or worm connection.

In addition, Blye stated in the affidavit that he has 10 years of law enforcement experience.

Blye and other law enforcement agents executed the first of three search warrants on November 11, 2004. During the search, the officers unexpectedly encountered "suspected narcotics and information related to the manufacture of methamphetamine" and returned to the magistrate to apply for a second and later a third search warrant. Upon discovering the alleged methamphetamine laboratory, the officers requested the assistance of a team of specially trained agents, including DEA Special Agent Jack Lynch. According to the government, this team of specially trained agents followed the standard procedures for scene safety mitigation, which calls for the destruction of certain chemicals and other tangible items.

On March 9, 2006, the court held an evidentiary hearing in this matter. The Varners' witnesses testified that they were in the Varners' garage on or about November 3, 2004, the date Bly stated in his search warrant affidavit that he conducted surveillance of the Varners' residence, and that they did not see the items described in his affidavit.[1] Blye testified in detail

---

[1] At the evidentiary hearing, the Varners told the court that they had subpoenaed Tony Gale; however, he did not appear for the hearing. According to the Varners' proffer, Gale would have testified that he was working on a truck with Charles Varner in the Varners' garage on the night of Blye's observation and that Gale did not see any still or any object that looked like an oil tank in the garage on that night. The Varners proceeded without Gale's testimony and presented other witnesses who testified to the same effect. The court notes that his testimony would not

about his surveillance of the Varners' residence and about his observations of the items his affidavit described. The court finds Blye's testimony credible and concludes that he attempted to describe his observations accurately. As his affidavit details, Blye conducted surveillance of the Varners' residence on November 3, 2004. The garage door was open, and Blye observed what appeared to him to be "a large tank consistent with a still; similar to an oil tank on its side occupying the left side of the garage. The tank appeared to have a vent pipe, which would be consistent with a 'doubler' or worm connection." Bly's affidavit contains neither an intentionally false statement nor one that was made in reckless disregard for the truth.

## II.

The Varners contend that Blye did not see nor could he have seen a still or anything that resembled an oil tank in their garage on November 3, 2004. It follows, the Varners argue, that Blye included false information in his affidavit, that this false information was essential to a finding of probable cause, and that, pursuant to Franks v. Delaware, 438 U.S. 154 (1978), the warrant is void. The court finds, however, that Blye is a credible witness and that he attempted to accurately report his observations to the magistrate. Accordingly, the court denies the Varners' Franks motion.

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that "in certain narrowly defined circumstances a defendant can attack a facially sufficient affidavit." United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990). To obtain an evidentiary hearing on the affidavit's integrity, "a defendant must first make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by

---

have changed the outcome of the hearing.

the affiant in the warrant affidavit.'" Id. "In addition, the false information must be essential to the probable cause determination." Id. If the defendant can make this preliminary showing and at the Franks hearing can establish the affiant's "material perjury or recklessness" by a preponderance of the evidence, "the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." Id. Moreover, if a warrant violates Franks, it is not subject to the Leon good-faith exception to the exclusionary rule. Id.

Here, Blye went to the Varners' residence, looked in the garage, and saw something that he believed to be a tank consistent with a still that had what looked like a vent pipe attached to it. The court finds that he did not fabricate this event or exaggerate what he saw. Instead, Blye carefully described his observations so as not to overstate them. He stated in the affidavit that he observed a "large tank *consistent* with a still; *similar* to an oil tank on it's side" and that "[t]he tank *appeared* to have a vent pipe." (emphasis added). Although, from his vantage point some distance away, Blye *may* have been mistaken about the size of the tank he saw, the court finds that his description was not intentionally false or made with a "reckless disregard for the truth." See Colkley, 899 F.2d at 301 (stating that "Franks protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*" and that "mere negligen[ce] in . . . recording the facts relevant to a probable-cause determination" is insufficient) (emphasis in original). Therefore, the court denies the Varners' Franks motion.

### III.

The Varners claim that because of the "bare bones" nature of Blye's affidavit, the magistrate issued the search warrant without probable cause, and that the court should suppress the evidence. Without reaching the question of whether the warrant is supported by probable

4

cause, the court finds the evidence seized pursuant to the warrant subject to the good-faith exception to the exclusionary rule.

Probable cause is "a fluid concept–turning on the assessment of probabilities in particular factual contexts," Illinois v. Gates, 462 U.S. 213, 232 (1983), and exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). "It is well settled that probable cause may be founded upon hearsay and information received from informants." United States v. Dequasie, 373 F.3d 509, 518 (4th Cir. 2004) (citing Franks, 438 U.S. at 165). No bright line rule exists to determine whether such information establishes probable cause. Id. Generally, "it is necessary to consider all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information," and "[t]he degree to which an informant's story is corroborated may also be an important factor." United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004).

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court established the good-faith exception to the exclusionary rule, holding that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Id. at 922. The Court identified four circumstances in which the good-faith exception would not apply: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) if "the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. V. New York, 442 U.S. 319 (1979)"; (3) if the affidavit supporting the

warrant "is so lacking in indicia of probable cause as to render official belief in its existence unreasonable"; and (4) if under the circumstances of the case the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923.

Without determining whether the warrant was supported by probable cause, the court will exercise its discretion and proceed directly to consideration of the Leon good-faith exception. See id. at 924-25. "This is a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place." United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002). Nothing suggests to this court that Blye "misled" the magistrate by knowingly or recklessly presenting false information, that the magistrate "wholly abandoned his judicial role," or that the warrant was "so facially deficient" that Blye could not have reasonably presumed it to be valid. Nevertheless, the Varners insist that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

The Varners ground their argument in United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996), in which the Fourth Circuit held that the good-faith exception did not apply due to the "bare bones" nature of the affidavit and "because the state magistrate could not have acted as other than a 'rubber stamp' in approving such an affidavit." Id. at 121. In so doing, the Fourth Circuit defined a "bare bones" affidavit as "one that contains 'wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." Id. In Wilhelm, the affiant stated in her affidavit that the informant was a "concerned citizen" and a "mature person with personal connections with the suspects" who "projected a truthfull [sic] demeanor." Wilhelm, 80 F.3d at 121. To corroborate the informant's

tip, the officer only confirmed directions to the defendant's house and indicated that the informant's description of a marijuana transaction was consistent with the officer's knowledge.

The court finds that Blye's affidavit is markedly different from the wholly conclusory affidavit the court found deficient in Wilhelm. Here, Blye corroborated the informant's tip by personally conducting surveillance of the Varners' residence and observing a still consistent with the informant's tip which Blye described in the affidavit, thus providing a factual base, not "bare bones" or mere conclusory statements. Thus, the court finds that the Leon good-faith exception applies and denies the Varners' motion to suppress.

## IV.

The Varners have moved to dismiss on the grounds that agents conducting the search destroyed glassware and chemicals in violation of 21 U.S.C. § 881(f)(2) and violated their due process rights.[2] The government responds that the agents followed standard DEA practices used when encountering a suspected methamphetamine laboratory; that the destroyed evidence did not possess an apparent exculpatory value; and that the agents did not act in bad faith. The court finds that the Varners have not established a due process violation or a sanctionable violation of 21 U.S.C. § 881 (f)(2) and denies their motion to dismiss.

The Varners assert that the government has violated Brady v. Maryland, 373 U.S. 83 (1963), which addresses the failure of the government to disclose exculpatory evidence to the defendant. Here, the issue is the "failure of the [government] to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which

---

[2]The Varners also allege that the agents violated state law by destroying the glassware and chemicals because this was a state search and seizure; however, the relevant inquiry in a federal prosecution is whether the search and seizure comported with federal and not state law.

might have exonerated the defendant," Arizona v. Youngblood, 488 U.S. 51, 57 (1989), and thus, the Youngblood test not Brady is applicable.³  Before Youngblood, the Supreme Court in California v. Trombetta, 467 U.S. 479 (1984), first "set forth the framework for assessing whether the destruction of evidence deprived the defendant of due process of law." United States v. Elliott, 83 F. Supp.2d 637, 642 (E.D. Va. 1999) (stating that Trombetta required defendants to prove that destroyed evidence was "constitutionally material," meaning that the evidence "possessed 'an exculpatory value that was apparent before the evidence was destroyed' and which was of 'such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means'") (quoting Trombetta, 467 U.S. at 489).  In Youngblood, the Supreme Court refined the Trombetta test and added that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58.  Moreover, the "presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id.  Therefore, to prevail under the Youngblood test, the Varners must prove that the destroyed evidence had apparent exculpatory value, that the officers were aware of the exculpatory nature of the evidence before its' destruction, that the officers acted in bad faith, and that no reasonable comparable evidence exists. See Elliott, 83 F. Supp.2d at 642-45 (describing the Trombetta/Youngblood analysis).

Attempting to prove bad faith, the Varners contend that the agents willfully violated 21

---

³The glassware and chemicals were at most "potentially useful," as illustrated by the Varners in their motion to dismiss, which argues for the need to "perform independent tests" on the destroyed evidence.

8

U.S.C. § 881(f)(2) and that this statute and not standard DEA practices provides the guidepost for the destruction of suspected methamphetamine laboratories. Section 881(f)(2), which concerns the forfeiture and destruction of Schedule I and II substances, provides that the "Attorney General may direct the destruction of . . . all dangerous, toxic, or hazardous raw materials . . . and any equipment or container . . . which cannot be separated safely from such raw materials." Here, the Varners have adduced no evidence, other than the government's photographs of the items the government destroyed, to show a violation of § 881(f)(2) and due process.[4] The Varners offered no credible evidence that the destroyed glassware and chemicals were exculpatory, that agents were aware that the items were in any way exculpatory, or that the agents destroyed these items for the purpose of depriving the Varners of exculpatory evidence.[5]

The Varners essentially argue that a violation of § 881(f)(2) constitutes bad faith *per se* and requires dismissal, suppression, or some other sanction. The court rejects the argument. First, the Varners have not proven that the government violated §881(f)(2) when it destroyed the glassware and chemicals. Second, even had the Varners proven that the destruction of the

---

[4] The government asserts that the DEA agent on the scene at the Varners' residence believed that the Varners were using the chemicals and glassware to make methamphetamine and followed standard DEA procedure. Though the Fourth Circuit has not addressed this issue, the Ninth Circuit denied a similar motion when officers declared certain items to be "contaminated" by methamphetamine production and destroyed the items pursuant to the "existing procedures of the Drug Enforcement Administration." See United States v. Heffington et. al., 952 F.2d 275, 280-81 (9th Cir. 1991) ("This routine disposal of the evidence was apparently not the product of any realization that the evidence could form a basis for exonerating the defendant.").

[5] See United States v. Deaner, 1 F.3d 192, 200 (3rd Cir. 1993) ("While a showing that the government did not follow standard procedure could provide some evidence of bad faith, we have not held that an improper procedure in and of itself implies bad faith."); Youngblood, 488 U.S. at 58 (stating that officer's negligence in failing to preserve evidence did not constitute bad faith).

9

glassware and chemicals violated §881(f)(2), they have not proven that the government did so knowing that it was violating the statute, knowing that the items were exculpatory, or knowing that it was somehow prejudicing the Varners' defense.

Youngblood provides the appropriate analytical framework for determining when a remedy or sanction should flow from the loss or destruction of exculpatory evidence in violation of the Due Process Clause. See Basden v. Lee, 290 F.3d 602, 615 (4th Cir. 2002); United States v. Elliott, 83 F. Supp.2d 637, 642 (E.D. Va. 1999). Yet, the Varners essentially suggest a more exacting *per se* bad faith rule for violations of §881(f)(2), a rule that would sanction non-knowing violations. However, their suggestion makes neither theoretical nor practical sense. Theoretically, the court can discern neither a reason nor a license to create an analytical framework separate and apart from Youngblood. Practically, a *per se* rule is simply hazardous. Law enforcement officials responding to methamphetamine laboratories often need to make split-second decisions affecting life and limb. Confronted by a *per se* rule that might result in the suppression of evidence or the dismissal of charges, law enforcement officials might feel pressed to preserve marginally significant evidence at the expense of public safety and health. Surely Youngblood strikes the appropriate balance, and the court follows it. Accordingly, because the Varners have not proven that the glassware and chemicals were exculpatory or that the government acted in bad faith when destroying these items, the court denies the Varners' motion to dismiss.[6]

---

[6] Here, the Varners failed to show that the destroyed evidence had apparent exculpatory value at the time the officers destroyed it. The Varners allege that they were engaged in the lawful attempt to extract platinum from metal, that the destroyed glassware and chemicals support this defense, and that DEA agents were aware of this lawful purpose when they

## V.

For the reasons stated, the court denies the Varners' motions to suppress and to dismiss.

**ENTER:** This 20th day of March, 2006.

_____
UNITED STATES DISTRICT JUDGE

---

destroyed the glassware and chemicals. At the most, the Varners proved that the majority of the glassware and chemicals were unused at the time of destruction, and at the hearing, the government conceded this point.